*Formatted for Electronic Distribution*                    *Not for Publication*

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICTS OF VERMONT

Filed & Entered
On Docket
June 19, 2019

_____

In re
**HERMITAGE INN REAL ESTATE**            **Involuntary Chapter 7**
**HOLDING COMPANY, LLC,**                 **Case # 19-10214**
         **Putative Debtor.**
_____

*Appearances:*  *Jess Schwidde, Esq.*              *Douglas Skalka, Esq.*
               *Glinka & Schwidde*                *Neubert, Pepe & Monteith, P.C.*
               *Rutland, Vermont*                 *New Haven, Connecticut*
               *For the Petitioning Creditors*    *For the Putative Debtor*

               *Andre Bouffard, Esq.*             *Patrick M. Birney, Esq.*
               *Downs Rachlin Martin PLLC*        *Robinson & Cole LLP*
               *Burlington, Vermont*              *Hartford , Connecticut*
               *For Ad Hoc Committee*             *For the Ad Hoc Committee*

               *Elizabeth Glynn, Esq.*            *David Dunn, Esq.*
               *Ryan, Smith & Carbine, Ltd.*      *Phillips, Dunn, Shriver & Carroll, P.C.*
               *Rutland, Vermont*                 *Brattleboro, Vermont*
               *For Berkshire Bank*               *For Barnstormer Summit Lift, LLC*

               *James Anderson, Esq.*             *Edward Adrian, Esq.*
               *Ryan, Smith & Carbine, Ltd*       *Monaghan Safar Ducham PLLC*
               *Rutland, Vermont*                 *Burlington, Vermont*
               *For Berkshire Bank*               *For the Town of Wilmington*

               *Paul F. O'Donnell, Esq.*          *Thomas P. Simon, Esq.*
               *Hinkley, Allen & Snyder LLP*      *McCormick, Fitzpatrick, Kasper & Burchard*
               *Boston, Massachusetts*            *Burlington, Vermont*
               *For Berkshire Bank*               *For the Putative Debtor*

               *Heather Ross, Esq.*               *John J. Kennelly, Esq.*
               *Sheehey Furlong & Behm*           *Pratt Vreeland Kennelly Martin & White*
               *Burlington, Vermont*              *Rutland, Vermont*
               *For FTI Consulting (Alan Tantleff)*  *For the Cold Brook Fire District*

## MEMORANDUM OF DECISION
### DETERMINING VERMONT TO BE THE PROPER VENUE FOR THREE HERMITAGE CASES

In this contested matter the Court must determine whether three pending bankruptcy cases, all related to the Hermitage Club in Wilmington, Vermont, should proceed in the Bankruptcy Court for the District of Vermont or in the Bankruptcy Court for the District of Connecticut. The Hermitage related debtors, which are incorporated in the state of Connecticut, wish to have their bankruptcy cases proceed in Connecticut. However, several of the debtors' key creditors, including most of their non-insider secured creditors, seek to have these bankruptcy cases, which will likely determine the viability and future of the Hermitage Club, proceed in the District of Vermont. For the reasons set forth below, and based on the unique facts and circumstances of the debtors and creditors who seek relief in these cases, the interest of justice, and the convenience of the parties, this Court determines all three cases shall proceed in the District of Vermont.

### JURISDICTION

The Court has jurisdiction over these contested matters pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Order of Reference entered on June 22, 2012. The Court declares the venue issues raised in the Hermitage-related cases, pending in both the District of Vermont and the District of Connecticut, to be core proceedings, pursuant to 28 U.S.C. § 157(b)(2)(A) and § 1412, over which this Court has constitutional authority to enter a final judgment.

### PROCEDURAL HISTORY

This case began less than one month ago, and there have already been four significant issues presented. The first issue was whether to appoint a fiduciary to oversee, protect and preserve the assets of the putative debtor. Three creditors, Bobbi Resek, Dan Solaz and Lakeland Bank (the "Petitioners") filed an involuntary chapter 7 bankruptcy petition (doc. # 1) against Hermitage Inn Real Estate Holding Company, LLC ("HIREHC"), on May 22, 2019. Two days later, Berkshire Bank filed a motion for an emergency hearing to retain the state court receiver in place, or alternatively, to appoint an interim chapter 7 trustee (doc. # 7). After granting a shortened notice period, considering the papers filed by various interested parties, and in light of the lack of any objection, the Court granted that motion to retain the state court receiver on May 30, 2019.

The second issue arose when, two days after the involuntary case was filed, HIREHC and its wholly owned subsidiary Hermitage Club, LLC, both of which were formed under the laws of the state of

2

Connecticut (collectively, the "Hermitage Debtors" or the "Debtors"[1]), filed voluntary chapter 11 cases in the Bankruptcy Court for the District of Connecticut (the "Connecticut Cases"). On May 29, 2019, this Court and the Bankruptcy Court for the District of Connecticut (Tancredi, J.) entered a Joint Preliminary Case Management Order (doc. # 27), which was docketed in both Districts and stayed all activity in the Connecticut Cases for ten (10) days. The two Courts expanded that order on May 31, 2019, when this Court set hearings on pending motions in the HIREHC case, and then entered a Joint Order Staying Parallel Bankruptcy Proceeding in the District of Connecticut (doc. # 34), that extended the stay until this Court entered a decision determining venue for the three cases.

Third, the so-called Ad Hoc Committee of Members (the "Ad Hoc Committee") filed a motion to intervene (doc. # 31). There was ultimately no objection to that motion[2] and based on a showing of cause, the Court granted that motion at the hearing held on June 11, 2019 (doc. # 82).

The fourth issue the parties in this case have raised is venue. On May 29, 2019, the Petitioners filed a Motion to Change Venue (doc. # 28) seeking a determination that Vermont was the proper venue for all three of these related cases, the HIREHC case and the Connecticut Cases (the "Hermitage Cases"). On May 31, 2019, the Hermitage Debtors filed a Motion to Transfer Case to Another District (doc. # 46). The Petitioners, Hermitage Debtors, Barnstormer Summit Lift, LLC, Berkshire Bank, the Town of Wilmington, VT, Cold Brook Fire District, and the Ad Hoc Committee all filed memoranda of law in support of their respective positions (doc. ## 28, 32, 62, 64, 65, 66, 67, 68, 70, 78, 79), in which all parties other than the Debtors argued in favor of venue in Vermont, and the Debtors argued for venue of the Hermitage Cases in Connecticut. This Court held an evidentiary hearing on the competing motions (doc. ## 28, 46, the "Venue Motions") which proceeded for three hours on June 11 and for over seven hours on June 12, and included testimony from nine witnesses. At the conclusion of that evidentiary hearing, the Court deemed the venue issue to be fully submitted and took it under advisement.

---

[1] Pursuant to Bankruptcy Rule 1014(b), this Court will determine the appropriate venue for all three of the bankruptcy cases related to the Hermitage Club, which involve two distinct corporate entities: HIREHC and Hermitage Club, LLC. Testimony presented at the evidentiary hearing on the venue motions described the relationship between the two entities as a "parent-child relationship" in which Hermitage Club, LLC acted as "an empty shell" and "subsidiary that purported to operate the club itself" while all "cash decisions" were made by HIREHC as the parent company (doc. # 81, testimony of former Chief Financial Officer Dan Solaz). Documentary evidence introduced by the parties confirms the entirely intertwined relationship between HIREHC and the Hermitage Club. See, e.g. Executive Employment Agreement, Debtors' Ex. 4 (containing an employment agreement between employee Solaz and HIREHC only, but describing HIREHC has "engaged in the business of operating, developing … and participating in all aspects of the Hermitage Club."). For these reasons, HIREHC and Hermitage Club, LLC will be collectively referred to as the "Debtors" throughout this decision.

[2] The Hermitage Debtors filed an objection to this motion on June 5, 2019 (doc. # 68), but subsequently withdrew it, subject to a reservation of their rights under Bankruptcy Rule 2019, in the event HIREHC proceeds in a chapter 11 case (doc #76).

## LEGAL QUESTION PRESENTED

The contested matters before the Court raise a single legal question: Since venue of the three Hermitage Cases is proper in both the District of Vermont and the District of Connecticut, in which District is venue most appropriate? In order to answer this question – one of first impression in this District – the Court must determine which location would best serve the interest of justice and the convenience of the parties, based on the totality of facts and circumstances these cases present.

## DISCUSSION

### A.  THE APPLICABLE VENUE STATUTES AND RULE

The venue analysis begins with reference to the applicable statutes and rules. The bankruptcy venue statute provides as follows:

> A case under title 11 may be commenced in the district court for the district
> (1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement…; or
> (2) in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership.

28 U.S.C. § 1408 (2017). There are thus four means by which a petitioning debtor may establish proper venue: (1) domicile, (2) residence, (3) principal place of business, or (4) location of principal assets. The Debtors are limited liability companies "organized and existing under the laws of the State of Connecticut" (JSOF, doc. # 77, ¶¶ 5, 6), and as such, venue for the voluntary chapter 11 case the Debtors filed on May 28, 2019, in the District of Connecticut, is proper pursuant to § 1408(1). Venue is also proper in the District of Vermont because the Debtors' "principal assets," consisting of various real estate holdings in and around the towns of Wilmington and Dover, Vermont, are located within the District of Vermont and nowhere else (JSOF, doc. # 77, ¶ 8) ("Neither HIREHCO nor the Club own any real estate located outside the State of Vermont."). Accordingly, venue for these bankruptcy cases would be proper in either the District of Connecticut or the District of Vermont.

A bankruptcy court "may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties." 28 U.S.C. § 1412 (2017). As another bankruptcy court recently observed, §1412 "does not directly address the circumstances before the Court, i.e. two bankruptcy petitions pending against the same debtor in different jurisdictions[.]" In re Caesars Entm't Operating Co., 2015 Bankr. LEXIS 314, at *15 (Bankr. D. Del. 2015). The Bankruptcy Code, however, does directly address the situation at issue here, through implementation of Bankruptcy

4

Rule 1014(b), which provides as follows:

> **Procedure when petitions involving the same debtor or related debtors are filed in different courts.** If petitions commencing cases under the Code or seeking recognition under chapter 15 are filed in different districts, regarding, by or against (1) the same debtor, (2) a partnership and one or more of its general partners, (3) two or more general partners, or (4) a debtor and an affiliate, <u>the court in the district in which the first-filed petition is pending may determine, in the interest of justice or for the convenience of the parties, the district or districts in which any of the cases should proceed.</u>

FED. R. BANKR. P. 1014(b) (emphasis added). Because the first petition, involuntary case # 19-10214, was filed in the District of Vermont, this Court must decide where these cases shall proceed.

"The decision of whether to transfer venue is within the court's discretion based on an individualized case-by-case analysis of convenience and fairness." <u>In re Enron Corp.</u>, 274 B.R. 327, 342 (Bankr. S.D.N.Y 2002) (citing cases). Both 28 U.S.C. § 1412 and Bankruptcy Rule 1014(b) are "written in the disjunctive, making transfer of venue appropriate *either* in the interest of justice *or* for the convenience of the parties, and that this statutory provision creates two distinct analytical bases upon which transfer of venue may be grounded." <u>In re Caesars Entm't Operating Co.</u>, 2015 Bankr. LEXIS 314, at ** 16–17 (Bankr. D. Del. 2015) (emphasis original). "Transferring venue of a bankruptcy case is not to be taken lightly," <u>In re Enron</u>, 274 B.R. at 342, and in assessing whether to transfer or retain a bankruptcy case, the court is not making any findings on a sister court's capability to successfully and efficiently administer the case. <u>See In re Caesars</u>, 2015 Bankr. LEXIS 314, at **27–28 (finding "the Illinois Court and the learned Judge assigned to the case are certainly no less capable" of policing the debtor's actions). Rather, the analysis considers the unique facts and circumstances of a given bankruptcy case, including, inter alia, the nature of a debtor and where its assets and operations are based, the location of creditors and necessary witnesses, and the impact of state regulatory agencies or state law on proceedings, in determining what venue best promotes the efficient administration of the bankruptcy estate.

Though decisions determining venue employ multi-factor tests in assessing whether transfer would serve the interest of justice or enhance the convenience of the parties, this is "a flexible standard" in which the court considers "whether transfer of venue will promote the efficient administration of the estate, judicial economy, timeliness and fairness." <u>See In re B.L. of Miami, Inc.</u>, 294 B.R. 325, 329 (Bankr. D. Nev. 2003) (citing <u>In re Enron Corp.</u>, 274 B.R. 327, 342 (Bankr. S.D.N.Y 2002)). "This more elastic approach is necessary because venue does not easily submit to hard and fast rules." <u>In re B.L. of Miami, Inc.</u>, 294 B.R. at 329. While the Second Circuit has not addressed the transfer of a bankruptcy

case pursuant to 28 U.S.C. § 1412, <u>see</u> <u>In re Enron</u>, 274 B.R. at 343, the multi-factored test employed by <u>In re Commonwealth Oil Refining Co.</u>, 596 F.2d 1239 (5th Cir. 1979) ("CORCO") is "cited in virtually every opinion … concerning the transfer of a bankruptcy case in its entirety." <u>In re Enron</u>, 274 B.R. at 344. Accordingly, this Court will apply the same multi-factored tests, originating in CORCO and deployed by bankruptcy courts in the Second Circuit, to the unique facts and circumstances of these Debtors, to determine whether the Hermitage-related cases shall proceed in Vermont of Connecticut. <u>See, e.g.</u>, <u>In re Abengoa Bioenergy Biomass of Kansas, LLC</u>, 2016 Bankr. LEXIS 1831, at *16 (Bankr. D. Kan. 2016) (employing CORCO factors); <u>In re Caesars Entm't Operating Co.</u>, 2015 Bankr. LEXIS 314, at *19 (Bankr. D. Del. 2015) (same); <u>In re Dunmore Homes, Inc.</u>, 380 B.R. 663, 671 (Bankr. S.D.N.Y. 2008) (same); <u>In re Enron Corp.</u>, 274 B.R. 327, 343–44 (Bankr. S.D.N.Y 2002) (same).

## B. The Burden of Proof

As the <u>Caesars</u> court noted in similar circumstances, "it is not entirely clear which party, if any, bears the burden of proof with respect to the present inquiry." <u>In re Caesars Entm't Operating Co.</u>, 2015 Bankr. LEXIS 314, at *17 (Bankr. D. Del. 2015). In most decisions considering the propriety of transferring a bankruptcy case, that decision is reached within the procedural posture of a single petition filed by a debtor or petitioning creditors, with a subsequent motion to transfer venue filed in the same court. In such circumstances, courts typically place the burden on the moving party to show by a preponderance of evidence that the transfer of venue is warranted. <u>In re Enron Corp.</u>, 274 B.R. 327, 342 (Bankr. S.D.N.Y 2002); <u>see also</u> <u>CORCO</u>, 596 F.2d 1239, 1241 (5th Cir. 1979); <u>In re Patriot Coal Corp.</u>, 482 B.R. 718, 739 (Bankr. S.D.N.Y. 2012); <u>In re Dunmore Homes, Inc.</u>, 380 B.R. 663, 671 (Bankr. S.D.N.Y. 2008); <u>In re Condor Exploration, LLC</u>, 294 B.R. 370, 377 (Bankr. D. Colo. 2003); <u>In re Industrial Pollution Control, Inc.</u>, 137 B.R. 176, 180 (Bankr. W.D. Pa. 1992); <u>In re Pavilion Place Associates</u>, 88 B.R. 32, 35 (Bankr. S.D.N.Y. 1988). The instant circumstances do not fit that pattern. Here, the Petitioners filed an involuntary petition in this district, and the Hermitage Debtors subsequently filed voluntary chapter 11 cases in a different district. Both the Petitioners and the Debtors filed competing motions to transfer venue (doc. ## 28, 62), complicating the question of which party would be bear the burden in this circumstance.

This Court concurs with the analysis in <u>Caesars</u> that the language of Bankruptcy 1014(b) implies a different burden of proof should be applied in instances where multiple petitions involving the same debtor are filed in different courts. <u>In re Caesars Entm't Operating Co.</u>, 2015 Bankr. LEXIS 314, at **17–18 (Bankr. D. Del. 2015). Unlike subsection (a), which allows the court to "transfer the case" upon

the motion of a party in interest, subsection (b) provides that the court in which the first-filed petition is pending "may determine" the district in which the cases should proceed. FED. R. BANKR. P. 1014(b). As Caesars observed, "[t]his wording seems to suggest that the burden is, in a manner of speaking, on the Court to determine the venue in which the cases should proceed …[and] [u]ltimately, this issue is best viewed in terms of deference as opposed to burden of proof." Id. at *18. This Court also concurs with Caesars that, in the context of two pending bankruptcy cases involving the same debtor, assessment of proper venue under Bankruptcy Rule 1014(b) involves a determination of the degree of deference that should be afforded the debtor's choice of forum and whether the opposing party, be it creditors, trustee, or U.S. trustee, has proffered enough evidence to overcome that deference, and sufficiently demonstrated that the "interest of justice" or "convenience of the parties" analysis favors their chosen forum.

The Debtors argue the Hermitage Cases should be venued in Connecticut because the Debtors are "entitled to the deference of the Court on [their] choice of venue" (doc. # 79). Courts normally give deference to the debtor's choice of forum when venue is proper, In re Patriot Coal Corp., 482 B.R. 718, 739 (Bankr. S.D.N.Y. 2012), but as Caesars astutely describes, "[t]he level of deference a debtor's choice of forum is entitled to is less clear in the situation where an involuntary bankruptcy petition was filed against the debtor in a different venue prior to the debtor filing its voluntary petition." In re Caesars Entm't Operating Co., 2015 Bankr. LEXIS 314, at *24 (Bankr. D. Del. 2015). As in Caesars, the Petitioners filed an involuntary bankruptcy first, in Vermont, before the Debtors filed their voluntary bankruptcy cases in Connecticut (JSOF, doc. # 77, ¶¶ 1, 3).

The Petitioners, echoing their counterparts in Caesar, argue their choice of forum is entitled to deference (doc. # 70, p. 3), based on the "judicially-created 'first-filed' rule, commonly applied in situations where there is concurrent civil litigation pending with respect to the same dispute." Caesars, 2015 Bankr. LEXIS 314, at *25. In balancing the competing claims for deference, the Caesars court based its rationale, in significant measure, on its finding that the involuntary petition before it "was clearly an anticipatory filing" since "the Petitioning Creditors were aware prior to the Petition Date that the Debtor was planning an imminent voluntary filing in the Illinois Court and with that knowledge made sure to win the race to the courthouse." Id. at *26. The Caesars court concluded that "rewarding the Petitioning Creditors' preemptive filing in another forum would set a bad precedent for future bankruptcy cases and limit the ability of future debtors to openly negotiate with creditors prior to filing a bankruptcy petition." Id. at **26–27. Citing this language, the Debtors argue here that "[n]o deference should be afforded to Petitioning Creditors simply because their race to the courthouse was swift" (doc. # 79, p. 3).

7

Not every instance in which an involuntary petition is filed just prior to a debtor's voluntary bankruptcy constitutes "an anticipatory filing." In Caesars, the bankruptcy court had before it persuasive evidence of an anticipatory filing: the debtor had publicly disclosed a restructuring support and forbearance agreement that required the debtor to file a voluntary bankruptcy petition between January 15 and January 20, 2015, and public news outlets reported that the debtor would likely file its voluntary bankruptcy petition in the Illinois Court. In re Caesars Entm't Operating Co., 2015 Bankr. LEXIS 314, at **6–7 (Bankr. D. Del. 2015). By contrast, in a comparable situation in which an involuntary petition was filed shortly before a voluntary chapter 11 bankruptcy case, the Bankruptcy Court for the District of Kansas had far less compelling evidence before it and found that although the petitioning creditors "sought involuntary relief more than ten days before the voluntary case was filed … [the debtor] presented no evidence that the petitioning creditors knew [the debtor] was going to file a voluntary chapter 11 in Delaware and that the Kansas involuntary was a preemptive strike." In re Abengoa Bioenergy Biomass of Kansas, LLC, 2016 Bankr. LEXIS 1831, at **22–23 (Bankr. D. Kan. 2016). Based on these facts and circumstances, the Kansas bankruptcy court determined that Kansas, where the involuntary case was filed, was the proper venue for the two cases.

The evidence before this Court reveals the circumstances are more analogous to those of Abengoa Bioenergy than to Caesars. Unlike Caesars, where petitioning creditors knew, with certainty, the five-day period during which the debtor would file its chapter 11 bankruptcy petition, the Petitioners here were unaware of when, if at all, the Hermitage Debtors would file for bankruptcy relief. Timothy Treanor, a 100k club member, Barnstormer Summit Lift, LLC investor, and steering committee member for the Ad Hoc Committee, testified about what he perceived to be the public's knowledge of any impending bankruptcy filing by the Debtors (audio available at doc. # 81). Mr. Treanor credibly testified that while the Debtors' founder and manager James Barnes had indicated a willingness and intent to reorganize under chapter 11, that filing did not materialize despite the passage of several months (doc. # 81). Mr. Treanor's perception and testimony are supported by the state-court appointed receiver Alan Tantleff, of FTI Consulting, who wrote the following in his Fifth Report as receiver: "Repeatedly throughout my tenure as Receiver," i.e., since May 17, 2018, "[the Debtor] has announced a 'restructuring' to members and the public" (doc. # 28, Ex. I, p. 3). The record supports the conclusion there was no reliable indication that a bankruptcy filing was imminent or certain. Mr. Treanor also testified to the "sense of urgency" that the Hermitage Club would be "in much worse position if it could not open for the winter," stating that, "given the history of promises not kept, the view was we could be

8

sitting here until the Fall [of 2019] or next winter and we would have lost the [ski] season" (doc. # 81). This uncertainty as to if or when the Debtors would file for bankruptcy relief is understandable given Mr. Barnes' own testimony that "he really didn't want to file for bankruptcy" and it was "the last thing I wanted to do in my life" (audio available at doc. # 86). The testimony of Mr. Treanor, Mr. Tantleff, and Mr. Barnes persuade the Court that Mr. Barnes did not communicate a specific date by which he would file a voluntary bankruptcy petition, he had a long history of intimating he would soon file a bankruptcy case but then not doing it, and the petitioning creditors believed the Hermitage Club would only be able to operate during the 2019-2020 ski season if a bankruptcy case was filed immediately. There is no testimony or evidence before the Court that suggests the Petitioners filed the involuntary case in Vermont in order to obtain some strategic advantage. Therefore, the Court concludes the involuntary case was not filed as a preemptive strike, to control the outcome, akin to the involuntary case filing in <u>Caesars</u>.

The deference typically afforded a debtor's choice of forum is also "not dispositive when the choice is not directly related to the underlying facts and issues in the case." <u>In re Abengoa Bioenergy Biomass of Kansas, LLC</u>, 2016 Bankr. LEXIS 1831, at **21–22 (Bankr. D. Kan. 2016) (citing <u>In re Rehoboth Hospitality, LP</u>, 2011 Bankr. LEXIS 3992, at *3 (Bankr. D. Del. 2011)), and when it bears little relationship to the location of the debtor's assets, creditors, and overall business activities. <u>See Abengoa Bioenergy</u>, 2016 Bankr. LEXIS 1831, at *23 (finding debtor entitled to less deference in context of a company "with few but valuable assets that are encumbered by liens" and which were not located in the debtor's chosen forum); <u>Rehoboth</u>, 2011 Bankr. LEXIS 3992 (granting motion to transfer where the debtor's only asset, a hotel, and most of its creditors, were situated in Texas). For similar reasons, the Hermitage Debtors' choice to file their chapter 11 bankruptcy cases in Connecticut "is not dispositive" because the Debtors' assets, the lion-share of their business activities, and the great majority of their non-member creditors are located in Vermont. As in <u>Abenogoa Bioenergy</u> and <u>Rehoboth</u>, the facts of this case reduce the extent of any deference that would generally be assigned to the Debtors' choice of bankruptcy forum.

Accordingly, this Court will not grant the Debtors' choice of forum any deference, but rather will consider which jurisdiction, Vermont or Connecticut, is more appropriate, based on the convenience of the parties and the interest of justice, and determine the venue for the Hermitage Cases, without requiring the Petitioners to overcome any level of deference as to the Debtors' choice of forum.[3]

---

[3] The Court finds, however, that, even if it were to apply a standard requiring the Petitioners to demonstrate that transfer of all cases to the District of Vermont is appropriate, by a preponderance of the evidence, the Petitioners would have met that burden

## C. The Convenience of the Parties Considerations

When discerning the convenience of the parties for purposes of transfer of venue under 28 U.S.C.

§ 1412 and Bankruptcy Rule 1014(b), courts look to the six factors set forth in CORCO:

(1) the proximity of creditors of every kind to the Court;
(2) the proximity of the debtor to the Court;
(3) the proximity of the witnesses necessary to the administration of the estate;
(4) the location of the assets;
(5) the economic and efficient administration of the estate; and
(6) the necessity for ancillary administration if liquidation should result.

In re Caesars Entm't Operating Co., 2015 Bankr. LEXIS 314, at *19 (Bankr. D. Del. 2015) (citing

CORCO, 596 F.2d 1239, 1247 (5th Cir. 1979)). The Court will examine each of these factors.

### 1. Proximity of Creditors

Consideration of the proximity and convenience of creditors "must include the number of

creditors as well as the amounts owed." In re Dunmore Homes, Inc., 380 B.R. 663, 676 (Bankr. S.D.N.Y.

2008) (citing In re Enron Corp., 274 B.R. 327, 343 (Bankr. S.D.N.Y 2002)). The Debtors place great

weight on the relative location of all potential claimants, arguing the schedules filed show "the majority

of creditors, by number and amount of claims, are located outside Vermont, with most located in

Connecticut and New York" (doc. ## 78, 79). The Debtors conclude that the "Vermont Bankruptcy Court

is a long distance for [those creditors] to travel in order to fully participate" in a bankruptcy proceeding at

that venue (doc. # 62, p. 4), based on affidavits from several Connecticut-based creditors (doc. # 79).

While it appears more of the Debtors' creditors, overall, are located in Connecticut, the Court must

consider the location of each category of creditors to conduct the CORCO analysis.

### (a) Proximity of Secured Creditors

In the Debtor's schedules, it lists 74 secured creditors and, of those, 35 are based in Vermont,

while only 6 are from Connecticut (doc. # 78). Initially, it would appear that a comparison of the amounts

of the secured claims by state yields a closer comparison: $8,897,568 of the secured debt is held by

Vermont-based claimants while $10,743,499 of the secured debt is by Connecticut-based claimants. But

the Court considers more than these raw numbers. It also factors in the position of any secured claimant

that has weighed in on the venue question, as well. Here, Barnstormer Summit Lift, LLC

("Barnstormer"), a Connecticut limited liability company that holds the largest, Connecticut-based

secured claim, in the amount of $9,252,753, emphatically favors venue of the Hermitage Cases in

---

for the reasons discussed below.

10

Vermont, and filed a memorandum of law articulating that position (doc. ## 32, 64). If Barnstormer were removed from the Connecticut column for purposes of this "counting of claim amounts" analysis – without even adding it to the Vermont column – the result is that $8,897,568 of the secured claims are held by Vermont claimants and $1,490,746 of the secured claims are held by claimants from Connecticut.

It is also noteworthy that in this case many of the Vermont-based holders of secured claims are tradespersons and vendors, who hold smaller claims secured by judgment or contractor liens (doc. # 78). It is likely to be burdensome to these creditors to have this case proceed in the Debtors' choice of forum, as these smaller Vermont-based lienholders are less likely than larger creditors to have the resources to hire Connecticut-based counsel. See In re Abengoa Bioenergy Biomass of Kansas, LLC, 2016 Bankr. LEXIS 1831, at *18 (Bankr. D. Kan. 2016) (finding that requiring mechanics lienholders "to go to the East Coast to defend their Kansas-based claims will undoubtedly be burdensome to them"); In re Dunmore Homes, Inc., 380 B.R. 663, 676 (Bankr. S.D.N.Y. 2008) (finding "the majority of trade creditors would not have to travel very far if venue was transferred to California."). Since the Hermitage Club is located in Vermont, it is not surprising that the number and amount of Vermont-based small, secured claims dramatically outnumber those from Connecticut.[4]

Based on the nature, number and amount of the secured claims in the record, it would, overall, be more convenient for the secured creditors to have venue of the Hermitage Cases in Vermont.

### (b) Proximity of Priority Unsecured Creditors

An examination of the location of the Debtors' priority unsecured creditors is similarly lopsided with three of the five priority creditors located in Vermont and none based in Connecticut. The three Vermont priority unsecured creditors, holding claims totaling $1,475,269, are the State of Vermont Department of Taxes, the Town of Wilmington, and the Town of Dover. The other two priority unsecured creditors are the Internal Revenue Service and the U.S. Department of Labor. The number and amount of Vermont-based priority claims, based on the Debtors' schedules, along with the work necessary to ascertain and resolve those claims, establish Vermont as the more convenient venue for the majority of this class of claimants.

### (c) Proximity of General Unsecured Creditors

The Debtors presented testimony at the evidentiary hearing from three unsecured creditors who

---

[4] Based on the Debtors' schedules (doc. # 78), of the 74 secured creditors listed, 30 of those are smaller trade creditors or vendors residing in Vermont, who collectively hold claims of approximately $3,267,390. By comparison, there are only 3 such creditors from Connecticut and their secured claims total only $76,836.

11

reside in Connecticut and contend that having the Debtors' chapter 11 bankruptcy cases proceed in
Vermont would be very inconvenient for them and impair their ability to participate (doc. # 81).

At first glance, the Hermitage Debtors' schedules (doc. # 78), and the graphs and charts the
Debtors presented summarizing those schedules (doc. # 79), appear to demonstrate that an overwhelming
number of their debts are held by claimants residing in Connecticut.[5] However, the figures provided by
the Debtors do not tell the whole story. In fact, the great majority of the Connecticut-based unsecured
claims against the Hermitage Debtors, as explained during the cross-examination of the Debtors' finance
director Chad Bullock, are held by the Hermitage Club members (audio available at doc. # 84).[6] Since
only two Hermitage Club members testified, it is not possible to determine which venue would be most
convenient for the majority of this group of general unsecured claimants. Additionally, it would be
inappropriate to give any significant weight to the affidavits the Debtor presented from members of this
group for three reasons.

First, the affidavits, and much of the testimony, appear to be premised on the idea that, if the
Hermitage Cases were venued in Vermont, all hearings would be held in Burlington, Vermont (doc. #
79). However, that is not a premise this Court adopts. The evidentiary hearing on the motions to change
venue and the hearing on the motion to intervene both took place in Rutland, Vermont and there is no
basis in the record for parties to conclude that most or all future hearings in this case would be conducted
in Burlington. The Court takes judicial notice of the fact that the Debtors' principal place of business and
assets are closer to Rutland, Vermont than to Hartford, Connecticut.[7]

Second, as most of the Connecticut-based creditors, including those who testified at the
evidentiary hearing, chose to contract with, invest in, or participate in, a golf and ski club located
squarely in Vermont, they cannot be surprised that the bankruptcy case of that club might be conducted
in Vermont. While venue in Connecticut may be more convenient to some individual Connecticut club
members, their voluntary joining of a private club in Vermont brings with it the expectation that any

---

[5] These charts assert, inter alia, that in the HIREHCO case, 89 claims are held by residents of Connecticut while 62 are held by
those in Vermont (doc. # 79, p. 7). In the separately filed Hermitage Club, LLC case, the Debtor asserts there are 239 claims
held by Connecticut residents and only 125 held by those in Vermont (doc. # 79, p. 9).

[6] On cross examination, Bullock did not contest counsel's representation that, if Mr. Barnes himself and the other club
members are removed from the total, the number of Vermont creditors would outnumber Connecticut-based creditors by
approximately 60 to 14 (doc. # 84).

[7] By the Court's own calculation, the distance from the Debtors' principal place of business, at 10 Gatehouse Trail,
Wilmington, Vermont, to the bankruptcy court in Rutland, Vermont is 65 miles, compared to the 95 miles between the
Debtors' location and the bankruptcy court in Hartford, Connecticut. The travel time comparison similarly favors Vermont,
with the time to drive from Wilmington to Rutland (1 hr. 37 min.) being slightly shorter than the time required to drive from
Wilmington to Hartford (1 hr. 48 min.)

bankruptcy proceeding involving that club could proceed in Vermont. Our sister bankruptcy court in Wyoming addressed this question and likewise found no basis for claims of surprise or disadvantage:

> Wherever most of the Debtor's creditors are located, most contracted with the Debtor and provided services or supplies, whether dealing with the Debtor's members in Oregon or Colorado, knowing that those services rendered or supplies provided were largely intended to benefit the Wyoming properties. It follows that creditors should not be surprised or disadvantaged by having to participate in the bankruptcy process in Wyoming.

In re Condor Exploration, LLC, 294 B.R. 370, 379 (Bankr. D. Colo. 2003).

Third, the nature of the Connecticut-based general unsecured creditors' claims – primarily as club members – must be considered when ascertaining how much weight to afford to their convenience, as contrasted with the convenience of the secured and priority creditors. If this case proceeds under chapter 11, as some unsecured club members have testified is their preference (doc. ## 79, 81), those members will have the opportunity to be – and typically would be – represented by an unsecured creditors committee. "An official committee of unsecured creditors has a duty to represent all general unsecured creditors, to the extent they have general unsecured claims" and "[t]he chief purpose of an official committee is to maximize distribution to this class." In re New Century TRS Holdings, Inc., 2013 Bankr. LEXIS 4021, at *11 (Bankr. D. Del. 2013). These statutory unsecured creditor committees "owe a fiduciary duty to the entire class of creditors represented by such committee and are required to place the collective interest of the class they represent above their own personal stake in the bankruptcy case." In re Residential Capital, LLC, 480 B.R. 550, 559 (Bankr. S.D.N.Y. 2012). The personal involvement of any one club member is likely to be minimal as their individual interests will be represented by the creditors committee. In the context of a comparable venue dispute, one of the other bankruptcy courts in this Circuit assessed the convenience factor of unsecured former employees and concluded it was "best addressed by a former employee representation approach[,]" which "would generally not require the claimants to actually appear in court to have their rights protected and concerns raised." See In re Enron Corp., 274 B.R. 327, 346– 47 (Bankr. S.D.N.Y 2002). That conclusion is equally applicable here. Each of the three unsecured creditors who testified in support of venue in Connecticut acknowledged that, in a chapter 11, a committee could, and would, represent their interests (doc. # 81), and thus there would be little, if any, need for them to appear in the bankruptcy court. Significantly, the Ad Hoc Committee, which claims to represent more than 187 of the unsecured club members, presented testimony and filed a memorandum of law squarely favoring venue in Vermont, asserting that venue is not inconvenient to the club members in that group (doc. # 38).

13

This Court thus concludes that although a large number of the general unsecured creditors are located in Connecticut, their convenience weighs less heavily than that of other classes for three reasons: only a small number of them have taken a position on venue but there are strong voices favoring each of the options; if the case proceeds in chapter 11, their rights will be addressed by an unsecured creditors committee; and if it proceeds in chapter 7 they will play only a very minor role, if any, in the case.

Having considered the convenience of each of the three classes of creditors – secured, priority unsecured, and general unsecured – and having determined that the great majority of the secured and priority unsecured creditors are either based in Vermont or have argued in support of venue in Vermont, the Court determines that this CORCO convenience factor favors venue in Vermont.

## 2. Proximity of the Debtor

The Hermitage Debtors are Connecticut-based limited liability companies (JSOF, doc. # 77, ¶ 5) and "thus may technically 'reside'" in Connecticut. In re B.L. of Miami, Inc., 294 B.R. 325, 331 (Bankr. D. Nev. 2003). However, all of the Debtors' real estate assets (JSOF, doc. # 77, ¶ 8), and the vast majority of their personal property (doc. 78), are in Vermont, HIREHC's registered mailing address is in West Dover, Vermont (JSOF, doc # 77, ¶ 5), and, as documented in the Subordinated Revolving Promissory Note between HIREHC and its founder James Barnes, HIREHC's principal place of business is in Wilmington, Vermont (Debtors' Ex. 12). The Debtors argue that "[b]eing based in Connecticut" has enabled the Debtors to "effectively engage with members, potential investors and lenders" (doc. # 68, p. 3), but Mr. Barnes testified that, while the Debtors did have a small Connecticut-based office at one time, the Debtors do not currently own an office in the state, and Mr. Barnes, and his assistant, instead work from their homes. See testimony at doc. # 86 ("Using technology so the idea of coming to an office became obsolete … I didn't come anymore and I worked from my home office; eventually we were down to one assistant who now works from home."). That the Debtors' business assets, principal place of business and real property are all in closer to Rutland, Vermont than to Hartford, Connecticut is entitled to greater weight than the Debtors' incorporation in Connecticut.

Another aspect of this CORCO convenience factor is the location of the Debtors' books and records. CORCO, 596 F.2d 1239, 1248 (5th Cir. 1979). The Debtors' former chief financial officer, Dan Solaz, testified that, as of his departure in 2017, all books and records were in Vermont and he never needed to travel to Connecticut for any record (doc. # 81). He and Mr. Barnes each testified that there are computer servers in both Connecticut and Vermont that can access all company documents (doc. ## 81, 83, 86). While many of the original documents, including member agreements, are in Connecticut, as

14

many courts have observed, this fact "is of little significance in weighing the relative convenience of the two forums" due to the instant access available to computer servers in either location. CORCO, 596 F.2d at 1248. See also In re Enron Corp., 274 B.R. 327, 348 (Bankr. S.D.N.Y 2002) ("Furthermore, the presence of the books and records in Houston is not a major concern because with modern technology that information, which is ordinarily computerized, can be readily transported via electronic mail."); In re B.L. of Miami, Inc., 294 B.R. 325, 332 (Bankr. D. Nev. 2003) ("Any financial records located here are easily transmitted to Florida in today's electronic age.").

In light of these facts, this CORCO factor also favors venue in Vermont.

### 3.   Proximity of the Witnesses Necessary to the Administration of the Estate

The proximity of witnesses necessary to the administration of the estate is a closer call, and more difficult to assess at this very early stage of the case. The Hermitage Debtors argue that this factor weighs decisively in favor of venue in Connecticut because Mr. Barnes, as founder and manager, would be a necessary witness and he resides in Connecticut (doc. # 62, p. 8). Mr. Barnes, however, was present and testified at the evidentiary hearing on the motions to determine venue and has commuted to and from Vermont in his management role for the Debtors for the past decade. Hence, this argument is unavailing.

The Debtors also argue that their proposed chief restructuring officer ("CRO"), pursuant to their Motion to Obtain Post Petition Financing (doc. # 19-20903, doc. # 13, the "DIP Financing Motion"), is based in Connecticut and would also be a necessary witness whose proximity should be a significant consideration (doc. # 62, p. 3). The Debtors filed the DIP Financing Motion in the HIREHC voluntary chapter 11 case, and neither bankruptcy court has yet addressed it, or even set it for hearing. Significantly, the largest secured creditor, Berkshire Bank, indicated in the instant proceeding that it adamantly opposes that motion. See doc. # 65, p. 2 ("Berkshire Bank will not consent to DIP financing."). While not as definitive in its opposition, Barnstormer has also signaled it will oppose the DIP Financing Motion, as evidenced by the testimony of Mr. Treanor, a member of the Barnstormer steering committee (doc. # 81) (testifying that, while Barnstormer has not polled all its investors, based on conversations with those parties, "there is no desire to see another creditor stand in front of Barnstormer investors.") Consequently, the participation and proximity of the proposed debtor-in-possession financier, Restructured Opportunities Investors, Inc. (the "DIP lender"), is far from assured, based on the speculative state of the Debtors' DIP Financing Motion. Additionally, it is unclear at this time, as Barnstormer has pointed out as well, whether the CRO "will be able to reorganize [the Debtors] remotely from Connecticut without spending significant time on-site in Vermont" (doc. # 64, p. 12), even

15

if the DIP Financing Motion were granted and the bankruptcy court appointed the CRO the Debtors have selected.

Another salient consideration is the fact that the individuals who have run the Debtors' operations are located in Vermont. The former Chief Financial Officer Dan Solaz testified that "the entire senior management lived and worked in Vermont" (doc. # 81). The record reflects the state-court appointed Receiver has been working in close proximity to the Debtors' principal place of business in Wilmington, Vermont. The Debtors' finance director, Chad Bullock, lives in Wilmington, Vermont. In the event of liquidation or sale of any or all of the Debtors' assets, the real estate brokers, appraisers, accountants, and auctioneers that will be employed are likely to be hired from Vermont. See, e.g., In re Old Delmar Corp., 45 B.R. 883, 885 (S.D.N.Y. 1985) ("Moreover, the property would best be appraised by those most familiar with the area [around the debtor's Texas apartment complex]; the witnesses would, therefore, most likely be from Texas."). While the Debtors' principal resides in Connecticut, other witnesses necessary to administration of the estate would likely reside in Vermont and find Vermont to be a more convenient venue. The Court cannot identify the witnesses who will be necessary in this case since it is impossible to predict at this time whether the Hermitage Cases will be centered on liquidation or reorganization, but in the end, the "physical location of witnesses is not as important a consideration as the other CORCO factors and, in balance, is far outweighed by all the other connections." In re B.L. of Miami, Inc., 294 B.R. 325, 332 (Bankr. D. Nev. 2003). It does appear, however, that whether it is through a chapter 11 plan or a chapter 7 administration, there is a distinct possibility the Debtors' assets will be sold through the bankruptcy process and therefore Vermont would be more convenient for the witnesses necessary to the administration of the estate.

4.  Location of the Assets

The weight to be assigned the location of the debtor's assets factor depends on the goal of the bankruptcy case. The Enron court observed that asset location is one of the less weighty factors in a transfer of venue dispute when "the ultimate goal is rehabilitation rather than liquidation." In re Enron Corp., 274 B.R. 327, 347 (Bankr. S.D.N.Y 2002) (citing CORCO, 596 F.2d 1239, 1248 (5th Cir. 1979)). Here, there is a significant disagreement in this case between the Debtors who seek to reorganize and a large number of their creditors who seek a liquidation. The Enron court also considered the significance of a debtor having either just one parcel of real estate or several parcels of real estate in close proximity to each other. In this regard, it found that "a debtor's location and the location of its assets are often important considerations in single asset real estate cases," but "take on less importance in a case where a

16

debtor has assets in various locations." Id. at 348. Here, the Debtors have more than one real estate asset, and thus this is not a single asset real estate ("SARE") case, but all the Debtors' real estate holdings are in and around the Hermitage Club in Wilmington, Vermont, (JSOF, doc. # 77, ¶ 8). In light of the geographic concentration of the Debtors' real estate in southern Vermont and the fact that liquidation is one of the viable options in these bankruptcy proceedings,[8] the location of the Debtors' assets takes on greater significance within the unique context of the Hermitage Cases.

The Debtors' only argument as to this factor is the Connecticut Bankruptcy Court "is closer to the Resort property than the Vermont Bankruptcy Court's location in Burlington, Vermont" (doc # 62, p. 8). This argument is not persuasive. First, the only hearings held in this case to date have been held in Rutland, and if the Hermitage Cases proceed in Vermont, this Court anticipates most, if not all, hearings will take place in its Rutland location. Second, unlike the locations at issue in other decisions resolving disputes over venue, the two potential venues here are not very far apart.[9] Third, and most fundamentally, the more accurate comparison is the distance between the Debtors' property and the Rutland bankruptcy court, on the one hand, and between the Debtors' property and the Hartford bankruptcy court, on the other. The former is the shorter distance. See, supra note 7. Additionally, "[w]here a debtor's assets consist solely of real property, as with Debtor in this case," courts have found that "matters concerning real property have always been of local concern and traditionally are decided at the situs of the property." In re B.L. of Miami, Inc., 294 B.R. 325, 332 (Bankr. D. Nev. 2003) (citing In re Enron Corp., 284 B.R. 376, 392 (Bankr. S.D.N.Y. 2002)); see also In re Abengoa Bioenergy Biomass of Kansas, LLC, 2016 Bankr. LEXIS 1831, at *21 (Bankr. D. Kan. 2016) ("In cases with one or a few assets, courts have favored sending them to or leaving them in venues where the assets are located.").

More importantly, it "makes good sense to locate the bankruptcy in a venue where the judge

---

[8] See discussion at Part C(6).

[9] In most of the pertinent decisions considering determination of venue under Bankruptcy Rule 1014, the competing venues are much farther apart and, consequently, the location of the debtor's assets was much closer to one potential venue than the other. See, e.g., In re Abengoa Bioenergy Biomass of Kansas, LLC, 2016 Bankr. LEXIS 1831 (Bankr. D. Kan. 2016) (deciding between venue in the District of Kansas and the District of Delaware where debtor's principal asset was an ethanol plant in southwest Kansas); In re Caesars Entm't Operating Co., 2015 Bankr. LEXIS 314 (Bankr. D. Del. 2015) (deciding between venue in the District of Delaware and the N.D. of Illinois where the debtor's assets, though geographically dispersed, were concentrated most heavily in Nevada); In re Patriot Coal Corp., 482 B.R. 718 (Bankr. S.D.N.Y. 2012) (deciding between venue in the S.D.N.Y. and the E.D. of Missouri where debtors' primary assets were in West Virginia and its corporate headquarters and executive offices were in St. Louis, Missouri); In re Dunmore Homes, Inc., 380 B.R. 663 (Bankr. S.D.N.Y. 2008) (deciding between venue in the S.D.N.Y. and the E.D. of California where debtor's principal main assets were California real estate); In re Pavilion Place Associates, 88 B.R. 32 (Bankr. S.D.N.Y. 1988) (deciding between venue in the S.D.N.Y. and the District of Minnesota where the debtor's sole asset was a shopping mall in Minnesota); In re Old Delmar Corp., 45 B.R. 883 (S.D.N.Y. 1985) (deciding between venue in the S.D.N.Y. and the S.D. of Texas where debtors' only asset was an apartment complex in Houston, Texas).

presiding would more likely have active familiarity with the community and the milieu" in which the debtor operates and, as such, "would be in a much better position to gauge the likelihood of an effective reorganization." In re B.L. of Miami, 294 B.R. at 332 (internal citation omitted). See also In re Dunmore Homes, Inc., 380 B.R. 663, 672 (Bankr. S.D.N.Y. 2008) (finding that, in the event of liquidation, the "[m]arkeing and selling of [the Debtor's] California real estate assets can best be overseen by a California bankruptcy court with greater familiarity with the market").

Taken together, the proximity factors of the CORCO analysis, and specifically the location of the Debtors' assets, favor venue in Vermont.

### 5. Economic and Efficient Administration of the Estate

Courts have generally found the factor analyzing which location would promote the most economic and efficient administration of the estate to be paramount. In re Enron Corp., 274 B.R. 327, 343 (Bankr. S.D.N.Y 2002) (citing CORCO, 596 F.2d 1239, 1247 (5th Cir. 1979)). The Debtors argue that administering the bankruptcy case in Vermont will result in additional costs because the Debtors have retained Connecticut-based counsel, and "would substantially increase the amount of time, and commensurately the fees, incurred by counsel with the increased burden of travel time and the increased cost of retaining local counsel" (doc. # 62, p. 6). The record in this case undercuts the strength of this argument. First, this Court has a permissive *pro hac vice* admission rule, and it granted the Debtors' attorney admission to this Court and a waiver of the local counsel requirement (doc. # 26). Second, with "electronic access to information and court dockets at every lawyer's fingertips," In re Caesars Entm't Operating Co., 2015 Bankr. LEXIS 314, at *23 (Bankr. D. Del. 2015), it is indisputable that Debtors' attorney will be able to continue in his role as lead counsel in an effective manner, if he so chooses.[10]

An additional aspect to this factor is whether the Debtors will need post-petition financing and the most likely source of such financing. In re Enron Corp., 274 B.R. 327, 348 (Bankr. S.D.N.Y 2002). The Debtors have made this one of their primary arguments in favor of venue of the Hermitage Cases in Connecticut, arguing the Debtors' ability to obtain the approval and support of their proposed DIP Lender and the proposed Debtor-in-Possession Loan and Security Agreement (Debtor's Ex. 3, the "DIP Agreement") depends on the bankruptcy cases being venued in Connecticut. To that end, the Debtors

---

[10] Mr. Skalka indicated at the June 12, 2019 hearing that he "is a Connecticut bankruptcy attorney and not a Vermont bankruptcy attorney," but in response to the Court's question about that distinction, he could only indicate that he was not familiar with this Court's customs and practices (doc. # 85). Since all of this Court's customs, practices, procedures, and expectations are set forth in its Local Rules, and Mr. Skalka affirmed he read those Local Rules as a condition of his admission *pro hac vice*, it would not appear that an attorney of his level of expertise and experience would find it unduly challenging to act as the Debtors' bankruptcy attorney if the Hermitage Cases proceed in Vermont.

already filed the DIP Financing Motion in the HIREHC voluntary chapter 11 (doc. # 19-20903, doc. #

13) and insist that quick approval of that Motion, and the underlying DIP Agreement, is critical. The

Debtors argue that only with that DIP Agreement will the Debtors "have the financial ability to maintain

their properties and focus their efforts on emerging from bankruptcy by the opening of the 2019/2020 ski

season" (doc. # 68, p. 3). Mr. Barnes testified that the DIP Lender's commitment to this loan is premised

on having its preferred Chief Restructuring Officer, who is based in Connecticut, appointed to lead the

reorganization effort (doc. # 86), and that he believes if the bankruptcy case proceeds in Vermont, the

DIP Lender may decline to proceed with the loan (doc. ## 83, 86).

       Putting aside the serious questions creditors have raised with respect to the Debtors' ability to

achieve the benchmarks set out in the DIP Agreement, as well as the opposition expressed by

Barnstormer and Berkshire Bank, see doc. # 65 ("Berkshire Bank will not consent to the DIP financing"),

for the purposes of this venue analysis, it is sufficient to find that this Court will be able to discern and

determine the viability of the DIP Agreement, and rule on the Debtors' pending DIP Financing Motion

and any other proposals for post-petition financing the Debtors may put forth, in a timely and effective

manner. Though the DIP Lender is based in Connecticut, this Court "can certainly determine whether the

amounts requested are appropriate and whether the extent to which the debtor's assets will be

encumbered is proper." In re Abengoa Bioenergy Biomass of Kansas, LLC, 2016 Bankr. LEXIS 1831, at

*20 (Bankr. D. Kan. 2016). Moreover, there is nothing preventing the Debtors from utilizing the same

DIP Lender for its post-petition financing if the case proceeds in Vermont. Mr. Barnes testified that,

despite his understanding about the lender's preference for, or expectation of, a Connecticut-based

transaction, there is no language in the proposed DIP Agreement which makes the loan contingent upon

the bankruptcy case proceeding in Connecticut (doc. # 83). See Abengoa Bioenergy, 2016 Bankr. LEXIS

1831, at *20 ("Nothing prevents this debtor from benefiting from a debtor in possession credit facility

that is approved in the Delaware cases."). Finally, there is no reason to believe Connecticut is the only

state where post-petition financing would be available to the Debtors. Mr. Barnes testified that, in

pursuing post-petition financing options, he had had conversations with potential lenders in Florida, Salt

Lake City, North Carolina, and Pennsylvania (doc. # 86). There is also nothing in the record to indicate

that any Connecticut lender who might undertake to enter into a post-petition DIP loan agreement would

require the case to proceed in Connecticut. Based on this record, the Debtors have failed to demonstrate

that establishing venue of this case in Connecticut would promote the most efficient and economic

administration of the bankruptcy estate, on the basis of the DIP's post-petition financing needs. See In re

Dunmore Homes, Inc., 380 B.R. 663, 672 (Bankr. S.D.N.Y. 2008) ("Postpetition financing has already been obtained from … a California resident … [and] [f]urther financing for a purchase of assets or a wind down of the business is just as likely to come from California as New York since the Debtor's main assets are the California real estate owned by its Subsidiaries.").

      An "important factor" courts consider in determining which venue would promote the most economic and efficient estate administration is the potential "learning curve" imposed on the transferee court, i.e. the lost time and resources expended in the prior jurisdiction and the additional time required of the new court to get up to speed on the particulars of the case." In re Enron Corp., 274 B.R. 327, 349 n. 23 (Bankr. S.D.N.Y 2002). Because of the short period between the date the Petitioners filed the involuntary case in Vermont and the date the Debtors filed their voluntary cases in Connecticut, and the bankruptcy courts' joint order staying all further proceedings until venue is determined (doc. # 34), the procedural posture at this juncture is unlike those in which the learning curve factor carried great weight. See, e.g., In re Rests. Acquisition I, LLC, 2016 Bankr. LEXIS 684 (Bankr. D. Del. 2016) (finding the learning curve weighed against transfer, specifically that the court "has spent a significant amount of time familiarizing itself with the Debtor's business and has granted numerous requests for relief in connection with these proceedings."); In re Enron Corp., 274 B.R. at 350 ("A transfer at this time would not promote judicial economy as it would only delay pending matters while a transferee court familiarized itself with the intricacies of these cases."). The Dunmore decision outlines a situation somewhat more analogous to the procedural posture of this case. In Dunmore, the bankruptcy court found "[t]he transfer motion … has been made early in the case [and] [w]hile this Court has gained some familiarity with the issues in this case by considering and ruling on First Day Motions …these are not likely to be the kinds of issues that will require the most court time in the future." In re Dunmore Homes, Inc., 380 B.R. 663, 672 (Bankr. S.D.N.Y. 2008); see also In re B.L. of Miami, Inc., 294 B.R. 325, 333 (Bankr. D. Nev. 2003) (finding, as part of its analysis of the learning curve, that it has "questioned venue from the beginning and has dealt only with relatively simple uncontested matters" in a case which "is in its early stages"). Here, the proceedings in the Debtors' chapter 11 voluntary cases were stayed prior to any determination on any of the Debtors' motions, so the learning curve factor does not play a significant role in this venue analysis.

      Finally, in determining which location would promote the most economic and efficient administration of the estate, the Court is mindful of the concerns expressed by Bankruptcy Court for the District of Colorado, when it weighed the potential costs to the chapter 7 trustee, depending on the venue of the case before it. In re Condor Exploration, LLC, 294 B.R. 370, 380 (Bankr. D. Colo. 2003). In

<u>Condor</u>, the Colorado bankruptcy court was resolving whether to transfer the involuntary case before it to the District of Wyoming, where all of the debtor's assets were located. It found the additional legal costs the estate would likely incur if the case were to remain in Colorado warranted significant weight, and ultimately tipped the scales in favor of venue in Wyoming:

> Were this Court to allow venue in Colorado and ultimately decide that the Debtor's case should proceed under Chapter 7, the United States Trustee would immediately face certain problematic administrative decisions in appointing a trustee for the case. If a Colorado panel trustee were selected, because of his or her proximity and convenience to the Colorado bankruptcy court, that trustee is likely to need both Colorado counsel, to handle hearings in Denver, and Wyoming counsel, to advise the trustee on the many Wyoming law issues that are bound to arise due to the Debtor's financial structure, operating history, and leasehold assets. If a Wyoming trustee were selected to administer a Colorado case, that trustee would require counsel in at least two states, as well. In this Court's view, with the case administration in Wyoming, the need for substantial involvement by Colorado counsel should be eliminated.

<u>Id.</u> A similar predicament could present itself here if this Court determines the most appropriate venue for the Hermitage Cases is Connecticut. In that event, a Connecticut-based trustee would likely be appointed, and that trustee would need Vermont counsel to deal with the myriad regulatory and state law issues already apparent in administering the Hermitage Debtors' collective estate – which consists almost entirely of Vermont-based real estate holdings. By contrast, if the case proceeds in Vermont, a trustee from the Vermont trustee panel would be unlikely to require a Connecticut attorney.

While this Court has no doubt that the esteemed bankruptcy judge in the District of Connecticut is more than qualified to effectively administer and preside over this case, for the foregoing reasons, it finds the facts and circumstances of these Debtors lead to the conclusion that venue in Vermont would promote the most efficient and economic administration of the case.

### 6. The Necessity for Ancillary Administration if Liquidation Should Result

The inquiry about possible ancillary administration as a factor in a venue determination is only rarely afforded significant weight, <u>see</u> <u>In re Enron Corp.</u>, 274 B.R. 327, 343 (Bankr. S.D.N.Y 2002) (finding "it unnecessary to contemplate the failure of this case at this early stage"), and, when it is, the inquiry focuses on the location of a debtor's assets. In a case with facts and circumstance rather similar to those at bar, in <u>In re Dunmore Homes, Inc.</u>, 380 B.R. 663, 672 (Bankr. S.D.N.Y. 2008), the majority of the debtor's assets were "not located in various locations but instead [were] mostly centralized in California." <u>Id.</u> at 677. This led the <u>Dunmore</u> court to conclude that "marketing and selling [the debtor's] California real estate assets can best be overseen by a California bankruptcy court with greater familiarity with the

21

market." Id. at 677. Here, the Debtors' assets are located entirely within the area around Wilmington, Vermont (JSOF, doc. # 77, ¶ 8) and, if those assets were to be liquidated through the Hermitage bankruptcy cases, the marketing and sale of those assets would be best conducted as close to the location of those assets as possible, and by a court with the most familiarity with the market. In another factually analogous case, the Bankruptcy Court for the District of Delaware described the benefit of this local expertise as follows:

> [T]he majority of issues in this case will revolve around the Hotel and its valuation and/or potential disposition. This will require familiarity with the local real estate market and application of Texas real property law. This Court could certainly familiarize itself with those issues in due course. The Texas Bankruptcy Court already has familiarity and knowledge with those issues and would better serve the interests of the Debtor and creditors which would also save the estate time and money … In the context of what is essentially a single asset case, the location of the lone improved real estate asset is of particular concern to the Court, especially in the event of a potential liquidation, and the case is better administered by a court in the district in which it is located.

In re Rehoboth Hospitality, LP, 2011 Bankr. LEXIS 3992, at *3 (Bankr. D. Del. 2011) (internal citation omitted). See also In re Pavilion Place Associates, 88 B.R. 32 (Bankr. S.D.N.Y. 1988) ("While we have no reason to believe that liquidation is inevitable here … there is a real possibility that he organization effort could fail [and] [i]f that were to happen, liquidation would be better accomplished in Minnesota [where the debtor's real estate asset is located]."); In re Old Delmar Corp., 45 B.R. 883, 885 (S.D.N.Y. 1985) ("Moreover, if liquidation should occur, the Texas court would be in the best position to efficiently and intelligently administer the real estate property."). The fact that the Debtors' assets consist almost entirely of real estate holdings in Vermont, and a successful non-sale reorganization is far from certain, this Court's knowledge and familiarity with the local market, as well as with pertinent Vermont law, support the conclusion that it could effectively preside over any potential liquidation in an efficient and timely manner. For that reason, this CORCO factor also favors venue in Vermont.

In sum, the Court reaches the following findings with respect to the convenience of the parties' analysis. The proximity of all types of creditors to the Court varies, but the most crucial category of creditors in this case will be the secured creditors and the majority of secured creditors are either based in Vermont, voiced a preference for venue in Vermont, or both. The location of the Hermitage Debtors and their assets, in Vermont, indicate Vermont would be the more convenient venue. While it is difficult to predict who the witnesses and professionals will be once these cases move forward, it is clear that if the Debtors' real property is to be sold (whether in chapter 7 or chapter 11), Vermont will be the more suitable

location, and if the Debtors proceed to reorganize there is no compelling evidence before the Court that the Vermont location would be unduly inconvenient. Finally, since many of the disputes that are evident, both from the Debtors' schedules and the record associated with the contested venue hearing, involve issues of Vermont law, this Court is best positioned to efficiently and economically resolve them.

### D. THE INTEREST OF JUSTICE CONSIDERATIONS

A separate basis for the determining the venue in which these cases should proceed under Bankruptcy Rule 1014 is the "interest of justice" test. The interest of justice prong "is a broad and flexible standard based on the facts and circumstances of each case." In re Enron Corp., 274 B.R. 327, 343 (Bankr. S.D.N.Y 2002). Courts evaluating the interest of justice have considered the following factors:

(1) whether transfer would promote the economic and efficient administration of the estate;
(2) whether the interests of judicial economy would be served by the transfer;
(3) whether either forum has an interest in having the controversy decided within its borders;
(4) whether the parties would be able to receive a fair trial in each of possible venues;
(5) whether the enforceability of any judgment would be affected by the transfer; and
(6) whether the plaintiff's original choice of forum should be disturbed.

In re Dunmore Homes, Inc., 380 B.R. 663, 672 (Bankr. S.D.N.Y. 2008) (citing Enron Corp v. Arora (In re Enron Corp.), 317 B.R. 629, 638–39 (Bankr. S.D.N.Y 2004)). The Court will address each of them.

### 1. Economic and Efficient Administration of the Estate

This factor has already been discussed as part of the convenience of the parties' analysis,[11] and favors venue of the Hermitage Cases in the District of Vermont. The Court will therefore not repeat the same analysis here. See In re Dunmore Homes, Inc., 380 B.R. 663, 676 (Bankr. S.D.N.Y. 2008) (citing In re Enron Corp., 274 B.R. 327, 343 (Bankr. S.D.N.Y 2002)).

### 2. Judicial Economy

The judicial economy prong includes consideration of the fact there are likely to be many disputes and legal issues in the Hermitage Cases that will be governed by Vermont law. Courts considering the question of venue have taken into account the frequency with which interpretation of state law is likely to arise in contested matters, and this has been viewed as especially important in deciding the venue of a bankruptcy case. See, e.g., In re Abengoa Bioenergy Biomass of Kansas, LLC, 2016 Bankr. LEXIS 1831, at *24 (Bankr. D. Kan. 2016) ("Validity of the mechanics lien claims turns on Kansas law and …[t]his court has the time and expertise to reach those any and other necessary issues with dispatch."); In re Dunmore Homes, Inc., 380 B.R. 663, 674 (Bankr. S.D.N.Y. 2008) (finding that because "many issues in

---

[11] See discussion at Part C(5).

this case are likely to be governed by California law, judicial economy would be better served if all cases were pending in California"); In re B.L. of Miami, Inc., 294 B.R. 325, 332 (Bankr. D. Nev. 2003) ("[I]ssues in controversy involve the interpretation and application of Florida statutes and case law which are unfamiliar to this court."). Here, the record identifies numerous issues, under Vermont municipal, tax, and regulatory law, that may require adjudication in the course of these bankruptcy cases. The Town of Wilmington underscored the importance of this consideration in the joinder it filed supporting venue of the Hermitage Cases in the District of Vermont. See doc. # 66 ("This Court's knowledge and experience in adjudicating [Title 32 V.S.A., Chapter 133, Subchapter 8] and other Vermont statutes impacting municipal corporations further serves the interest of justice and by extension, the residents of the Town [of Wilmington]."). While its sister court in the District of Connecticut is definitely competent to interpret Vermont state law, this Court's 19-plus years of experience construing Vermont law in bankruptcy cases will enable it to promptly and efficiently decide those questions, and bolsters the conclusion that venue in Vermont serves the interest of justice.

There are numerous regulatory hurdles the Debtors will need to overcome in order to reorganize under chapter 11. This will also call on the bankruptcy court overseeing the cases to interpret and apply Vermont law. The Condor court expounded upon the advantages of that case proceeding in the state in which the critical regulatory bodies were located:

> In addition, the oil and gas industry is a highly regulated one, involving serious geological, environmental and reclamation issues of most importance to the state of Wyoming and the local counties and communities where operations have taken place. These regulatory agencies, local government units and general-creditor suppliers must play a crucial role in any bankruptcy case. The Debtor should be able to better coordinate its Wyoming administrative and regulatory matters with a pending bankruptcy case if both are in Wyoming.

In re Condor Exploration, LLC, 294 B.R. 370, 379 (Bankr. D. Colo. 2003). Here, the Debtors' facilities and operations will need to comply with numerous requirements regardless of whether the Debtors reopen operations pursuant to a chapter 11 reorganization plan or sell the property. As the Petitioners accurately describe, "Vermont state and local regulatory and land use agencies and taxing authorities will similarly play critical roles in any diligence required to get the [Debtors'] Facilities sold or operationally up and running" (doc. # 28, p. 13). These facts and circumstances persuade the Court that it will best serve the interest of judicial economy for these cases to proceed in Vermont.

3.  Forum with an Interest in Having the Controversy Decided Within Its Borders

This factor starts with the premise that there is value in retaining jurisdiction of a debtor's

24

bankruptcy cases in the district within which the outcome of the controversy will have the most significant
impact. The Debtors' real estate holdings "span some 1,000 acres located in the Towns of Wilmington and
Dover Vermont" (doc. # 28, p. 2), and the closure of those facilities has cost those communities greatly in
terms of lost jobs and tax revenue. As the Town of Wilmington stated in its joinder supporting venue of
the Debtors' cases in Vermont, "[i]n addition to the potential loss of jobs and tax revenue, depending on
the length of the proceedings it is more likely the outcome of this matter may substantially impact the
Town's operations and budgets" (doc. # 66, p. 1). In his testimony, Mr. Solaz discussed the impact on the
local economy since the Debtors ceased operations, going beyond the nearly 200 employees who lost their
jobs and extending to the loss of work opportunities for local craftsmen and vendors (doc. # 81). The
nature of the Debtors' operations, with a narrow focus on real estate and business operations within two
small communities in Vermont, play a great role in favoring the venue of Vermont over Connecticut. As
the Dunmore court explained:

> The Debtor's assets and business are in residential home building properties within
> California, giving California a strong interest in the impact of the disposition of those
> assets to the areas and communities in which they are located. California also has a
> greater interest than New York because the majority of the trade creditors in this case
> are local California businesses …

In re Dunmore Homes, Inc., 380 B.R. 663, 674 (Bankr. S.D.N.Y. 2008). By comparison to the outsized
impact the Debtors' operations, and the cessation thereof, have had on the economy of southern Vermont,
the effect on Connecticut is hard to discern. These considerations persuade the Court that Vermont is the
forum with the most substantial interest in having the Hermitage-related cases decided within its borders.

### 4 & 5. The Fair Trial and Enforcement of Judgements Factors

Neither the parties' right to a fair trial nor the need for an assurance that all judgments will be
properly enforced has a consequential impact on the interest of justice analysis in this venue dispute.
Neither party has asserted they are more likely to have fair proceedings in one venue over the other. Based
on the record, the Court concludes "this [fair trial] factor does not weigh in favor" of either venue. See In
re Bruno's, Inc., 227 B.R. 311, 328 (Bankr. N.D. Ala. 1998). Similarly, none of the parties have presented
arguments with respect to the enforceability of judgments factor. Thus the Court concludes this factor is
neutral. Neither of these factors plays any part in this Court's "interest of justice" analysis.

25

6. <u>Plaintiff's Original Choice of Forum</u>

As described above,[12] a debtor's choice of forum is generally entitled to some level of deference if venue of the debtor's filing is proper. <u>In re Enron Corp.</u>, 274 B.R. 327, 342 (Bankr. S.D.N.Y 2002). But, even allowing for that deference, which "is less clear in the situation where an involuntary bankruptcy petition was filed against the debtor in a different venue prior to the debtor filing its voluntary petition," <u>In re Caesars Entm't Operating Co.</u>, 2015 Bankr. LEXIS 314, at *24 (Bankr. D. Del. 2015), the unique facts and circumstances presented here warrant overriding the Debtors' forum choice, for several reasons.

First, the rationale the <u>Caesars</u> court articulated, and the conclusion it reached, namely that the debtor had provided "sufficient justification" for its choice of forum, depended on factual circumstances easily distinguishable from those at bar. In <u>Caesars</u>, the debtor "demonstrated that its decision to file in the Illinois Court rather than [the Delaware Court] was premised on [its] analysis of different applications of the law in the judicial circuits in which [the Delaware Court] and the Illinois Court operate and that those differences could benefit the Debtor's reorganization efforts." <u>Id.</u> at *27. Those differences in court procedures and controlling law that the <u>Caesars</u> court cited are not applicable here as both the District of Vermont and the District of Connecticut are within the same circuit. <u>See also</u> <u>In re Interlink Home Health Care</u>, 283 B.R. 429, 442 (Bankr. N.D. Tex. 2002) ("Even assuming it is appropriate for this Court to decide a venue issue on the premise that a debtor should not be burdened by case law binding in this district, it does not appear that any advantage would accrue to Phoenix or Americare by reason of Third Circuit law in this area.").

Second, following the sage approach of the <u>Caesars</u> court, this Court finds it is appropriate to take notice of the serious allegations creditors have raised against the Debtors' principal in determining the degree of deference that should be afforded the Debtors' choice of forum. <u>See</u> <u>Caesars</u>, 2015 Bankr. LEXIS 314, at *28 ("The Court also readily recognizes that the Debtor's conduct leading up to the filing of the Voluntary case is, on its face, suspect. There are serious allegations …that the Sponsors engaged in a series of self-dealing transactions resulting in the fraudulent transfer of very substantial assets out of the reach of the Debtor's creditors."). The Court is cognizant of the allegations raised against Mr. Barnes as the subject of at least two recent federal cases in the District of Vermont. <u>See</u> <u>RTM Capital Partners v. James Barnes</u>, no. 5:18-cv-56 (D. Vt.); <u>Golden v. Hermitage Inn Real Estate and Barnes</u>, no. 2:19-cv-18 (D. Vt.). While the Court reaches no conclusion as to the veracity of these allegations or merits of the

---

[12] <u>See</u> discussion at Part B.

26

pending litigation, they call into question the Debtors' principal's motives behind his choice of forum. This factor does not weigh heavily, but it does tip the scales, in this interest of justice analysis, slightly in favor of venue in the forum chosen by the creditors rather than the Debtor.

Third, any general inclination to defer to the Debtors' forum choice, here, is kept in check by the nature and location of its operations. The Debtors, and James Barnes as founder and manager, chose to operate a golf club and ski resort in the state of Vermont. While the Debtors are incorporated under Connecticut law, all of their business operations, including efforts to recruit members in Connecticut, New York, and elsewhere, were designed to further the operations in Vermont. Although the record lacks sufficient evidence for the Court to discern how the scope and scale of the Debtors' marketing and promotion efforts in Connecticut compare to the magnitude of the Debtors' primary operations in Vermont, see In re Toxic Control Technologies, Inc., 84 B.R. 140, 144 (Bankr. N.D. Ind. 1988), there is little to connect the Debtors to Connecticut other than the principal's residence, their incorporation, and their efforts to secure financing in that state. See In re Dunmore Homes, Inc., 380 B.R. 663, 673 (Bankr. S.D.N.Y. 2008). That is too flimsy a nexus to justify deference to the Debtors' choice of forum in light of all of the considerations weighing against that choice.

Finally, the Debtors cannot reasonably claim to be surprised if they are required to pursue bankruptcy relief in Vermont, where all of their operations are located. See In re Pavilion Place Associates, 88 B.R. 32, 36 (Bankr. S.D.N.Y. 1988) ("Having chosen to purchase a shopping center in Minnesota, the Debtor knowingly subjected itself to the possibility of legal action in that state …"); see also In re Dunmore Homes, 380 B.R. at 675 (finding transfer of venue California appropriate based on "the thin nexus of the Debtor to the Southern District of New York, and the overwhelming contacts between the Debtor and Eastern District of California[.]")

Having considered all of the interest of justice factors, the Court finds that (1) the economic and efficient administration of the estate factor, (2) the judicial economy factor, (3) and factor assessing the forum with an interest in having the controversy decided within its borders, all weigh in favor of Vermont; and that the (4) fair trial and (5) the enforcement of judgements factors are neutral; and that (6) the Debtors' original choice of forum does not weigh in favor of Connecticut. Under the facts and circumstances of these Hermitage Cases, the Court assigns the greatest weight to the first factor and the least amount of weight to the last factor. Based on these findings as to the merits and weight of each of these well-established factors, this Court concludes that, on balance, the interest of justice factors weigh decidedly in favor of a Vermont venue for these cases.

## CONCLUSION

For the reasons set forth above, and pursuant to the mandate of Bankruptcy Rule 1014(b), as the Court in which the first of the Hermitage Cases was filed, this Court finds that it best serves both the interest of justice and the convenience of the parties for the three Hermitage Cases to proceed in Vermont. Accordingly, an Order will be entered (i) granting the Motion to Change Venue that the Petitioners filed (doc. # 28), (ii) denying the Motion to Transfer Case to Another District that Hermitage Inn Real Estate Holding Company, LLC filed (doc. # 46), and (iii) determining that all three Hermitage Cases shall proceed in the Bankruptcy Court for the District of Vermont, effective immediately.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law.

June 19, 2019
Burlington, Vermont

Colleen A. Brown
United States Bankruptcy Judge

28

*Formatted for Electronic Distribution*                                    *Not for Publication*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICTS OF VERMONT



Filed & Entered
On Docket
June 19, 2019

_____

**In re**
**HERMITAGE INN REAL ESTATE**
**HOLDING COMPANY, LLC,**
      **Putative Debtor.**

_____

**Involuntary Chapter 7**
**Case # 19-10214**

*Appearances:*  *Jess Schwidde, Esq.*
            *Glinka & Schwidde*
            *Rutland, Vermont*
            *For the Petitioning Creditors*

            *Andre Bouffard, Esq.*
            *Downs Rachlin Martin PLLC*
            *Burlington, Vermont*
            *For Ad Hoc Committee*

            *Elizabeth Glynn, Esq.*
            *Ryan, Smith & Carbine, Ltd.*
            *Rutland, Vermont*
            *For Berkshire Bank*

            *James Anderson, Esq.*
            *Ryan, Smith & Carbine, Ltd*
            *Rutland, Vermont*
            *For Berkshire Bank*

            *Paul F. O'Donnell, Esq.*
            *Hinkley, Allen & Snyder LLP*
            *Boston, Massachusetts*
            *For Berkshire Bank*

            *Heather Ross, Esq.*
            *Sheehey Furlong & Behm*
            *Burlington, Vermont*
            *For FTI Consulting (Alan Tantleff)*

            *Douglas Skalka, Esq.*
            *Neubert, Pepe & Monteith, P.C.*
            *New Haven, Connecticut*
            *For the Putative Debtor*

            *Patrick M. Birney, Esq.*
            *Robinson & Cole LLP*
            *Hartford , Connecticut*
            *For the Ad Hoc Committee*

            *David Dunn, Esq.*
            *Phillips, Dunn, Shriver & Carroll, P.C.*
            *Brattleboro, Vermont*
            *For Barnstormer Summit Lift, LLC*

            *Edward Adrian, Esq.*
            *Monaghan Safar Ducham PLLC*
            *Burlington, Vermont*
            *For the Town of Wilmington*

            *Thomas P. Simon, Esq.*
            *McCormick, Fitzpatrick, Kasper & Burchard*
            *Burlington, Vermont*
            *For the Putative Debtor*

            *John J. Kennelly, Esq.*
            *Pratt Vreeland Kennelly Martin & White*
            *Rutland, Vermont*
            *For the Cold Brook Fire District*

## ORDER
### DETERMINING VERMONT TO BE THE PROPER VENUE FOR THREE HERMITAGE CASES

For the reasons set forth in the memorandum of decision of even date, IT IS HEREBY ORDERED that, pursuant to 28 U.S.C. § 1412, Bankruptcy Rule 1014(b), and 11 U.S.C. § 105,

    (i)  the Petitioners' Motion to Change Venue (doc. # 28) is GRANTED,

    (ii)  Heritage Inn Real Estate Holding Company, LLC's Motion to Transfer Case to Another District (doc. # 46), is DENIED, and

    (iii)  all three Heritage Cases* shall proceed in the Bankruptcy Court for the District of Vermont, effective immediately.

IT IS FURTHER ORDERED that the Clerk of this Court shall convey this Order and the underlying Memorandum of Decision to the Bankruptcy Court for the District of Connecticut.

SO ORDERED.

June 19, 2019                                          Colleen A. Brown
Burlington, Vermont                                   United States Bankruptcy Judge

_____

\* In order of the date of filing, the three cases are as follows:
    1. In re Hermitage Inn Real Estate Holding Company, LLC, no. 19-10214 (Bankr. D. Vt., May 22, 2019)
    2. In re Hermitage Inn Real Estate Holding Company, LLC, no. 19-20903 (Bankr. D. Conn., May 28, 2019)
    3. In re Hermitage Club, LLC, no. 19-20904 (Bankr. D. Conn., May 28, 2019)